[Cite as *State ex rel. Brahler v. Kent State Univ.*, 2013-Ohio-5299.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio ex rel.
Valerie Brahler,                  :

                                   :

         Relator,             :

                                     :               No. 13AP-143

v.                                 

                                   :           (REGULAR CALENDAR)

Kent State University and
Industrial Commission of        :
Ohio,

         Respondents.        :

---

# D E C I S I O N

### Rendered on December 3, 2013

---

*Zwick Law Offices Co., L.P.A.,* and *Victoria Zwick Klapp,* for relator.

*Amer Cunningham Co. LPA,* and *Thomas M. Saxer,* for respondent Kent State University.

*Michael DeWine*, Attorney General, and *John R. Smart,* for respondent Industrial Commission of Ohio.

---

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

BROWN, J.

{¶ 1} Relator, Valerie Brahler ("claimant"), has filed this original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order that denied permanent total disability ("PTD") compensation and to enter an order granting said compensation.

{¶ 2} This matter was referred to a court-appointed magistrate pursuant to Civ.R. 53(C) and Loc.R. 13(M) of the Tenth District Court of Appeals. The magistrate issued the

appended decision, including findings of fact and conclusions of law, and recommended that this court deny claimant's request for a writ of mandamus. Claimant has filed objections to the magistrate's decision.

{¶ 3}  Claimant first argues that the magistrate erred when she failed to address her argument that the commission abused its discretion when it failed to address the significance of her rehabilitation efforts following the denial of her first application for PTD in light of *State ex rel. Bryant v. Indus. Comm.*, 74 Ohio St.3d 458 (1996), and *State ex rel. Cliff v. Auburndale Co.*, 111 Ohio St.3d 490, 2006-Ohio-6111. Claimant argues that this case presents a unique situation in light of the fact that the commission previously issued a denial of PTD on November 30, 2010, in which it stated that claimant's failure to fully explore or participate in vocational rehabilitation was a significant factor in denying PTD. Claimant asserts that, after this initial denial, she participated in rehabilitation for three months but was unable to continue such because of neck pain. Claimant concedes that the commission is the exclusive evaluator of disability and is not bound to accept vocational evidence, but argues that here the commission itself made rehabilitation participation a primary concern in its previous denial order, so the commission should be required to address her subsequent rehabilitation.

{¶ 4}  The magistrate dedicated five pages of her decision addressing the commission's failure to consider her attempts at vocational rehabilitation in its second order. In rejecting claimant's argument, the magistrate cited *State ex rel. Guthrie v. Indus. Comm.*, 133 Ohio St.3d 244, 2012-Ohio-4637, in which the Supreme Court of Ohio held that the fact that the Staff Hearing Officer ("SHO") did not view the worker's rehabilitation efforts favorably does not affect the validity of the order. The court in *Guthrie* reasoned that the commission is exclusively responsible for interpreting the vocational evidence, the rehabilitation division made both favorable and unfavorable comments about the worker's participation, and the commission was permitted to accept the unfavorable comments over the favorable ones. In the present case, the magistrate found that, similar to *Guthrie*, the rehabilitation division made both positive and negative comments concerning claimant's rehabilitation efforts, and the commission could accept the negative comments as the ultimate interpretation of vocational evidence. The magistrate also noted that relator did not attempt vocational rehabilitation from the time

she stopped working in 2002 until her first application for PTD was denied in 2010, and then she only participated in vocational rehabilitation for three months. We concur with the magistrate's determinations.  Claimant presents no authority for the proposition that the commission is required to address rehabilitation efforts where the commission made rehabilitation participation a concern in a prior denial order. Even under these circumstances, it remains that the commission is the exclusive evaluator of vocational evidence and may believe or disbelieve the vocation evidence submitted.

{¶ 5}   With regard to claimant's reliance upon *Bryant* and *Cliff*, we find these cases inapposite to the present case. In both cases, the commission issued inconsistent orders. In *Cliff*, the commission denied the claimant temporary total disability benefits because he had voluntarily left the workforce when he retired but then two years later awarded the claimant PTD benefits while implicitly declaring that claimant involuntarily left the workforce. In *Bryant*, the Supreme Court found an inconsistency between the commission's actions and words, in that the commission cited the claimant's occupational longevity as evidence that retraining is unimpeded by age, but several months earlier, the commission refused to refer claimant to its own rehabilitation division because it felt that claimant was too old. The court stated that claimant either was or was not too old for effective retraining—he could not be both.

{¶ 6}   In the present case, there is no conflict between the commission's January 7, 2011 order and its June 9, 2012 order. Both orders denied PTD compensation. The commission found in the January 7, 2011 order that claimant's failure to participate in vocational rehabilitation was a "significant" factor in denying PTD, but also denied the claim based upon the medical and psychological evidence showing that claimant was not permanently and totally disabled. In the June 9, 2012 order, the commission again found that claimant was not permanently and totally disabled based upon the medical and psychological evidence. Given such circumstances, we cannot find an inherent conflict like those in *Bryant* and *Cliff*. For these reasons, we overrule claimant's first objection.

{¶ 7}   Claimant next argues that the SHO's order of June 5, 2013 that denied PTD compensation relied on Dr. Michael Murphy's original report of December 16, 2011 and his addendum of May 14, 2012, but the commission had implicitly rejected both reports when it previously granted her motion seeking additional psychological treatment, in

violation of *State ex rel. Zamora v. Indus. Comm.*, 45 Ohio St.3d 17 (1989) (it is inconsistent for the commission to reject a medical report at one level, for whatever reason, and rely on it at another). However, we agree with the magistrate that *State ex rel. Kish v. Kroger Co.*, 135 Ohio St.3d 451, 2013-Ohio-1931, provides a proper basis for distinguishing the present case from those in *Zamora*. Based upon *Kish*, the magistrate correctly found that, because Dr. Murphy's May 2012 and December 2011 reports were prepared to address two different issues, the commission rejecting Dr. Murphy's opinion with regard to additional counseling (as addressed in the May 2012 addendum) did not prohibit the commission from relying upon his opinion with regard to PTD (as addressed in the December 2011 report). Furthermore, we find claimant's attempt to distinguish *Kish* on the basis that the addendum report in that case was not issued at the time of the original decision—whereas, in the present case, both the original and addendum reports were issued prior to the May 16, 2012 decision on additional treatment—does not alter the applicability of the underlying rationale in *Kish*. For these reasons, claimant's second objection is overruled.

{¶ 8}   After an examination of the magistrate's decision, an independent review of the record pursuant to Civ.R. 53, and due consideration of claimant's objections, we overrule the objections and adopt the magistrate's findings of fact and conclusions of law. Claimant's writ of mandamus is denied.

*Objections overruled and writ of mandamus denied.*

CONNOR and O'GRADY, JJ, concur.

———————————————

[Cite as *State ex rel. Brahler v. Kent State Univ.*, 2013-Ohio-5299.]

# APPENDIX

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

State of Ohio, ex rel.                            :
Valerie Brahler,
                                                   :                   No. 13AP-143

            Relator,                               :

                                                   :               (REGULAR CALENDAR)
v.
                                                   :
Kent State University and
Industrial Commission of                          :
Ohio,
            Respondents.                           :

---

## M A G I S T R A T E ' S   D E C I S I O N

### Rendered on August 15, 2013

---

*Zwick Law Offices Co., L.P.A.,* **and** *Victoria Zwick Klapp,* **for relator.**

*Amer Cunningham Co. LPA,* **and** *Thomas M. Saxer,* **for respondent Kent State University.**

*Michael DeWine*, **Attorney General, and** *John R. Smart,* **for respondent Industrial Commission of Ohio.**

---

## IN MANDAMUS

{¶ 9} Relator, Valerie Brahler, has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order which denied her application for permanent total disability ("PTD") compensation and ordering the commission to find that she is entitled to that compensation.

<u>Findings of Fact</u>:

{¶ 10} 1. Relator sustained a work-related injury on February 20, 1984. At the time, relator attended and was working two days a week for respondent Kent State University.

{¶ 11} 2. Relator's workers' compensation claim has been allowed for the following conditions:

> Cervical sprain; prolonged depressive reaction; ganglion, right wrist; aggravation of pre-existing cervical spinal stenosis C5-C6.

{¶ 12} 3. After graduating from college in 1997, relator found employment in the field of music.

{¶ 13} 4. Relator received periods of temporary total disability ("TTD") compensation over the years and last worked in June 2002.

{¶ 14} 5. Relator did not participate in vocational rehabilitation between 2002 and 2009.

{¶ 15} 6. The stipulation of evidence is devoid of medical records from 2002 through 2009. The magistrate found two references to relator's medical condition during this time period. In his February 23, 2012 report, Dr. Metz notes that relator had a normal EMG/NCV study on May 19, 2002, and an MRI on September 19, 2007 revealed broad central C5-C6 disc herniation impinging on the anterior aspect of the cervical cord and degenerative disc disease at C6-C7.

{¶ 16} 7. In 2009, the commission referred relator for vocational rehabilitation services; however, in a letter dated December 21, 2009, relator was notified that her rehabilitation file was being closed because her treating physician, Mark J. Pellegrino, M.D., indicated that she was not able to work because of ongoing pain.

{¶ 17} 8. Relator filed her first application for PTD compensation on May 3, 2010.

{¶ 18} 9. Relator's application for PTD compensation was heard before a staff hearing officer ("SHO") on November 30, 2010 and was denied. The SHO relied on the August 19, 2010 report of Kirby Flanagan, M.D. and the August 27, 2010 report of James Lyall, Ph.D. Dr. Flanagan opined that relator's allowed physical conditions had reached maximum medical improvement ("MMI"), assessed a 15 percent whole person

impairment, and concluded that relator was capable of performing light-duty work provided that she lift a maximum of 20 pounds at waist level and do no lifting or work above shoulder level.  Dr. Lyall opined that relator's allowed psychological condition had reached MMI, assessed a 15 percent whole person impairment, and concluded that the psychological condition was not work prohibitive.  Dr. Lyall did indicate that relator should avoid high stress work involving complex social contact.

{¶ 19} The SHO found that relator's age of 53 years was a neutral vocational factor. The SHO noted that relator's college education and 4 years of voice lessons were positive vocational factors and specifically noted that she had been able to use her college degree in a number of jobs.  The SHO also concluded that relator's employment history was a positive vocational factor.  The SHO noted that relator last worked in 2002 and did not seek referral for vocational rehabilitation until late 2009.  Thereafter, the SHO discussed the records from relator's treating physician from that relevant time period, stating:

> The file reflects the injured worker last worked in 2002 and did not seek referral to vocational rehabilitation until late 2009. Work-related restrictions were given by the physician of record, Mark Pellegrino, M.D., in a report dated 10/15/2009 indicating the injured worker was capable of sitting for eight hours per eight-hour work day, standing and walking for less than two hours per eight-hour work day, occasionally bending and squatting, frequently lifting five pounds and occasionally lifting up to twenty pounds, frequently carrying ten pounds and occasionally carrying up to thirty pounds, using her hands repetitively for simple grasping and fine manipulation, and using her feet repetitively for the operation of leg controls. Dr. Pellegrino indicated on 10/15/2009 these restrictions were permanent.
>
> It is significant to note these permanent restrictions given by the physician of record on 10/15/2009 closely correspond to the injured worker's residual functional capacity for light work as found by Dr. Flanagan on 8/19/2010. The restrictions imposed by Dr. Flanagan would also permit the injured worker to engage in sedentary work activities.
>
> The injured worker was found to be eligible for participation in vocational rehabilitation but not feasible as Dr. Pellegrino's 09/04/2009 treatment record and 11/02/2009 report, issued just seventeen days after Dr. Pellegrino completed the form regarding the injured worker's

permanent work-related restrictions, indicated respectively the injured worker was unable to work in any capacity and was not a candidate for vocational rehabilitation. Dr. Pellegrino did not explain his vacillating opinions. The vocational rehabilitation closure dated 12/21/2009 was not appealed by the injured worker.

{¶ 20} The SHO concluded that relator was capable of performing light-duty work within the restrictions of Dr. Flanagan and that her vocational factors were positive and she was not entitled to an award of PTD compensation. The SHO concluded, stating:

The instant decision, which accepts the opinion of Dr. Flanagan regarding the injured worker's residual functional capacity, rejects the opinion of Dr. Pellegrino as stated in his treatment records and reports dated 11/02/2009 and 01/08/2010. Accordingly, the medical evidence used to determine the injured worker was not feasible for participation in vocational rehabilitation is expressly rejected.

Permanent total disability is a compensation "of last resort, to be awarded only when all reasonable avenues of accomplishing a return to sustained remunerative employment have failed." State, ex rel. Wilson v. Industrial Commission (1997), 80 Ohio St. 3d 250, 253. The injured worker's residual functional capacity for light work with physical and psychological restrictions, middle age, college degree and ability to learn, and varied work experience make her a candidate for rehabilitation and re-entry into the workforce. The failure to fully explore or participate in vocational rehabilitation is a significant factor in denying this benefit of last resort.

The evidence in file demonstrates the injured worker is capable of performing light work with no lifting or work above the shoulders and can perform work which is not high-stress or involves complex social contact. The injured worker is only fifty-three years of age and received a college degree in 1997. The injured worker's educational and work histories demonstrate an ability to learn and to use her college education vocationally. The injured worker's vocational factors demonstrate she is capable of work in both the sedentary and light work levels beyond just entry-level positions.

> Based on the above-listed physical capacities and non-medical disability factors, the Staff Hearing Officer finds the injured worker's disability is not total, and that the injured worker is capable of engaging in sustained remunerative employment, or being retrained to engage in sustained remunerative employment. Therefore, the injured worker's request for an award of permanent disability benefits is denied.

{¶ 21} 10. After the commission denied her first application for PTD compensation, relator's counsel wrote a letter to the Ohio Bureau of Workers' Compensation ("BWC") on January 26, 2011, asking that she be referred for rehabilitation services:

> We represent Valerie Brahler in regards to her industrial injury of February 20, 1984. Please be advised that her permanent and total disability was denied based upon a State report and the Staff Hearing Officer dated 11/30/10. It is the opinion of the Staff Hearing Officer that the claimant cannot engage in her prior occupation that she was involved in at the time of her injury, but she can perform light duty work and she needs to undergo rehabilitation services. We therefore are referring her for rehabilitation services and have contacted Mary Ann Rohrig to perform those services.

{¶ 22} 11. Dr. Pellegrino completed a C-140 indicating that relator could sit for eight hours and stand and walk each for two hours provided that she have frequent breaks. He opined that relator could occasionally bend and squat, rarely reach, and never crawl or climb. He further opined that relator could frequently lift up to 5 pounds and occasionally lift up to 20 pounds, but that she could not lift over 20 pounds. In terms of carrying, Dr. Pellegrino opined that relator could frequently carry 10 pounds and occasionally carry up to 25 pounds, but not more than 25 pounds. Relator could use both her hands for simple grasping and fine manipulation, but not for pushing and pulling arm controls. Further, he noted that relator could use both her feet for repetitive movements of leg control provided for brief periods of time only.

{¶ 23} 12. Relator participated in vocational rehabilitation services with Goodwill Industries for approximately three months, from February 28, 2011 through May 20, 2011. According to the weekly progress reports, relator did not progress well. Specifically, excerpts from those reports indicate the following:

[March 8, 2011:] Ms. Brahler was present two out of five scheduled days including her intake on Monday[.] * * * Ms. Brahler reported that she did not have any business casual clothing[.] She was given a voucher to try and find some at the Goodwill stores[.] Ms. Brahler also reported that she was unsure how many hours she would be able to train in the computer lab due to her stamina level[.] It was decided that she would report daily, but for at least a two hour shift[.] Her time would increase as she became more comfortable[.] Ms. Brahler cooperated with all directions and was polite, but did not always allow volley of conversation[.] Given the opportunity, Ms. Brahler would often talk until she was cut off[.] However, she was able to focus when given a computer task such as the testing without difficulty[.]

[March 15, 2011:] Ms. Brahler was present four out of five scheduled days[.] She was absent on 3/11 when she reported that the weather was too bad for her to come to work[.] While in the computer lab, Ms. Brahler watched videos on how to operate a computer[.] She completed the GCF LearnFree training in Basic Computer Skills, Email Skills and Microsoft XP[.] Ms. Brahler reported that her stamina limit has remained around two hours per day[.] Two of the four days she was able to stay an extra fifteen minutes[.] M[s]. Brahler had improved in her dress as she wore business attire four out [of] her four days present[.] She is cooperative and remains focused once she starts with the training[.]

[March 22, 2011:] Her time in the lab ranged from 1.5 to 3.25 hours per day[.] She complains of being in constant pain[.] While in the lab, Ms. Brahler continued to watch videos on email skills, Microsoft XP and moved on to Word 2007[.] Ms. Brahler reported that even though she scores well on her tests she does not remember anything the next day and has to watch the videos all over again which frustrates her[.] She will often talk a great deal about her pain level to whoever is around and does not allow volley of conversation[.]

[March 29, 2011] Her time in the lab ranged from 2 to 3 hours per day and increased her weekly time by fifteen minutes[.] While in the lab, she watches GCF LearnFree videos daily[.] It is often the same videos or tutorials[.] Ms. Brahler stated that she does not remember instructions from day to day[.] Ms. Brahler worked on a coping and filing assignment with another participant but was sent home because she was not completing any work[.] Ms. Brahler

stated that she was in pain and was upset that she could not keep up with the other participant[.] Ms. Brahler was also introduced to Dragon Speaking Naturally so that she would be able to control the computer without the use of her hands[.] Ms. Brahler completed the training of Dragon but did not make any effort to use the program afterwards but instead continued to watch the videos on Word 2007[.]

[April 5, 2011:] Her time in the lab ranged from one hour and fifteen minutes to three hours per day and her overall weekly time decreased by two hours and fifteen minutes[.] Ms. Brahler was given a three minute typing test which she reported that she should be able to complete[.] However after that three minutes, Ms. Brahler reported that she was in a great amount of pain and had to leave after one hour and fifteen minutes[.] The next day, she was able to stay in the lab for one hour and forty-five minutes[.] While in the lab, she watches GCF LearnFree videos daily[.] It is often the same videos or tutorials[.] Ms. Brahler stated that she does not remember instructions from day to day[.] Ms. Brahler also worked on her second GCF LearnFree assignment[.] Ms. Brahler did not make any attempt to use Dragon Naturally speaking to help her with her computer work[.] She reported that she felt that it was too much to learn at the same time and would rather focus on learning basic computer skills and Word 2007[.] On 3/31 Ms. Brahler and two other participants were observed talking and not focusing on their work[.] Ms. Haubert stated that they were talking about a recent computer assignment as well as the status of their programs[.] Ms. Brahler stated that she was upset because it was reported that she talked about her pain level with others[.]

[April 13, 2011:] She was late 4/04/11 because she reported that she wore the wrong shoes for an office environment and returned home to change them. Her time in the lab ranged from three hours on 4/04/11 to a half an hour on 4/08/11. Ms. Brahler reported that she usually rested on the weekends so that she would have the mobility and stamina to try and last the week. Ms. Brahler continued to watch videos of GCF LearnFree and completed her second and third assignment in Microsoft Word 2007. She received a certificate of completion from GCF LearnFree for completing this course. Ms. Brahler was then asked to try Dragon Speaking Naturally again. She worked with this program on Thursday and Friday but reported that the headphones were hurting her ears and neck. She completed a short assignment using

Dragon, but reported later that she used her hands to type it out as well. She was reminded of her restrictions and how Dragon was suppose[d] to accommodate for the use of her hands.

[April 18, 2011:] Ms. Brahler's time in the lab this week ranged from 1.50 hours to 2.25 hours. However Ms. Brahler mentioned that she took several 10 minute to 15 minute breaks to stretch and walk. Ms. Brahler worked through the tutorial in Dragon Speaking Naturally and also used Dragon to recreate short paragraphs and forms. Ms. Brahler reported the headphones she needed to use hurt her neck but she couldn't understand why as they were very light. Ms. Brahler also mentioned pain in her arms and back. While this conversation was taking place this writer noticed that Ms. Brahler was gesturing with her arms while talking. She was asked if that was painful for her. She reported that she never thought about it, but no, it was not. She added that while gesturing she kept her arms to the side so that they were supported.

[April 26, 2011:] Ms. Brahler was late on 4/22 when she reported that she needed to take her car into the mechanic. Ms. Brahler was also five minutes late on 4/20 but did not offer an explanation. Ms. Brahler's shifts varied from 2 hours to 2.50 hours. During this time, Ms. Brahler took 1-2 fifteen minute breaks. While in the lab, Ms. Brahler practiced working with Dragon. She went through a Word tutorial and also learned some of the commands to direct and browse the Internet. Ms. Brahler was friendly and cooperative with all staff and co-workers. However she was reminded to speak appropriately in an office setting as she complimented this writer in an inappropriate way.

[May 3, 2011:] Her hours varied from 2.25 hours to 2.5 hours daily with at least two ten minute breaks. While in the computer lab, Ms. Brahler practiced using Dragon Naturally Speaking both but using Microsoft Word and the Internet. She was asked to complete one research assignment using both Dragon and the Internet and was able to complete it by sending the needed information to this writer's email. Ms. Brahler works-slowly but her focus has improved since she has been moved to the accommodation room where she can use Dragon without disturbing others.

[May 10, 2011:] Ms. Brahler's shifts ranged from 1.75 hours to 2.6 hours for a total of 10.50 hours this week. Ms. Brahler

reported that her neck was very sore and because of this arms were very shaky, painful and non-responsive, making it difficult to concentrate. However, Ms. Brahler has made progress with Dragon as she has been using it to improve her Microsoft Word skills, complete research over the internet and write emails. She sends this writer a daily email using Dragon with little to no mistakes each day.

[May 17, 2011:] Her time in the lab ranged from 1.5 hours to 2.5 hours. Ms. Brahler increased her Dragon Naturally Speaking skills by completing research on life skills such as banking and shopping for groceries and prescription using Dragon online. Ms. Brahler also learned more about using Dragon with her email program. Ms. Brahler complained of pain in her neck that radiates to her arms making it difficult to type or move.

[May 26, 2011:] Ms. Brahler's time in the lab ranged from .5 hours to 2.25 hours. She reported that she took at least 1-2 ten minute breaks during this time. While in the lab, she used Dragon to work on her email skills as well as completing the Prove It! testing that was also given to her at the beginning of her program. She worked on these tests for the last four days of her program and was unable to finish them due to reported pain and fatigue.

{¶ 24}   13. Ultimately, relator's rehabilitation file was closed because she did not progress.

{¶ 25} 14. Relator filed her second application for PTD compensation on July 26, 2011. In support of her application, relator submitted two reports from Dr. Pellegrino, dated June 6 and June 21, 2011 respectively. Dr. Pellegrino opined that: relator's participation in vocational rehabilitation exacerbated her allowed cervical conditions, caused her increased pain; she was not a viable candidate for rehabilitation; and that she was totally and permanently disabled. Relator also submitted the June 8, 2011 report of Suresh A. Patel, M.D. Dr. Patel opined that relator was permanently and totally disabled as a result of her allowed psychological condition.

{¶ 26} 15. Relator was examined by Michael A. Murphy, Ph.D. In his December 16, 2011 report, Dr. Murphy identified the medical records which he reviewed and concluded that relator had a mild psychological impairment. Dr. Murphy conducted

certain psychological testing, including the Millon Clinical Multiaxial Inventory-III and specifically noted the following:

> This patient's response style suggests a moderate tendency toward self-deprecation and a consequent exaggeration of current emotional problems. In interpreting the profile, the clinician should be aware that the patient may have reported more psychological symptoms than objectively exist.
>
> * * *
>
> Testing shows a strong "fake bad" response set in which Ms. Brahler overly exaggerated and distorted her problems. This limits the validity of the test findings as Ms. Brahler's true level of problems/symptoms is likely to be less than what is indicated in the following test results.

{¶ 27} Ultimately, Dr. Murphy concluded that relator had a mild psychological impairment and that she could perform any work for which she was otherwise qualified.

{¶ 28} 16. Relator was also examined by Steven V. Van Auken, Ph.D. In his February 7, 2012 report, Dr. Van Auken opined that: relator's allowed psychological condition had reached MMI; found a moderate psychological impairment of 28 percent; and relator's depressive symptoms would prevent her from succeeding in sustained remunerative employment.

{¶ 29} 17. The commission referred relator to Karl V. Metz, M.D., for an independent medical examination. In his February 23, 2012 report, Dr. Metz set out the allowed conditions in relator's claim, identified the medical records which he reviewed, provided his physical findings upon examination, and opined that relator's allowed physical conditions had reached MMI and assessed a five percent whole person impairment. Dr. Metz opined that relator could perform medium level work with no lifting greater than 20 pounds on an occasional basis, as well as no ladder climbing and no prolonged work at or above shoulder level.

{¶ 30} 18. Because relator also filed a motion seeking authorization for additional psychological treatment, Dr. Murphy was asked to prepare an addendum. In his May 14, 2012 addendum, Dr. Murphy opined that relator's allowed psychological condition had reached MMI and that, while psychotherapy should not be discontinued abruptly, he recommended four to six sessions to prepare her for the termination of services.

{¶ 31} 19. On May 16, 2012, an SHO granted relator's request for limited psychotherapy and medication management with Dr. Patel.

{¶ 32} 20. Relator's application for PTD compensation was heard before an SHO on June 5, 2012. The SHO relied on the medical report of Dr. Metz and concluded that relator was capable of performing medium work activities with the additional restrictions Dr. Metz provided. Further, the SHO relied on Dr. Murphy's report to find that relator's impairment was mild and that she was capable of performing work activities.

{¶ 33} Thereafter, the SHO discussed the non-medical disability factors and found her age of 54 years was a neutral factor, her education and her prior work history were positive vocational factors. Specifically, in concluding that relator was capable of performing some sustained remunerative employment, the SHO stated:

> The Injured Worker is 54-years of age. The Injured Worker's age is a neutral factor as many Employers prefer seasoned workers with maturity and experience. Also, age alone is never a total bar to employment.
>
> The Injured Worker's education level is also a positive factor. The Injured Worker graduated from Oakwood High School in 1975 and testified she graduated from Kent State University in 1997. Possession of a college degree is an asset in the workforce as many prospective Employers are seeking college graduates. Also, this accomplishment is evidence of the Injured Worker's mental acumen to perform the basic tasks associated with sedentary, light, and medium work activity.
>
> The Injured Worker also has additional training in music. She took voice lessons from a private instructor for four years. The Injured Worker reported that she has work experience leading choirs in various churches.
>
> Also, the Injured Worker reported that she can read, write, and perform basic math equations and operate a computer. These skills are useful in the performance of entry level sedentary, light, and medium work activity.
>
> The Injured Worker has a positive and varied employment history, including skilled employment. She has worked as a cashier, assembly line worker, switchboard operator, audio-visual assistant, choir director, and director of music at a church.

The Injured Worker has worked a variety of jobs and has demonstrated numerous temperaments, including: working with money, working with the public, repetitive work, performing work to close tolerances and standards, and performing a variety of job duties.

Additionally, the Injured Worker has experience working in the musical field. She report [sic] that she wrote mass and special liturgies, directed multiple choirs, including an adult choir, contemporary choir, and a children's choir. She used her educational knowledge as she obtained her bachelor of arts in music and applied this knowledge to her job duties as a choir director and director of music.

The Injured Worker also reported that she supervised two employees in her job as the director of music. The Injured Worker's ability to direct and control others is a positive factor favoring re-employment.

Given the Injured Worker's completion of college and past skilled work with supervisory duties, the Staff Hearing Officer concludes the Injured Worker's disability is not total. Therefore, the Staff Hearing Officer concludes the Injured Worker can perform medium work activity within the recommendation of Drs. Metz and Murphy.

{¶ 34} 21. Relator filed a motion for reconsideration which the commission denied finding that relator had failed to meet her burden of proving that sufficient grounds existed to justify the exercise of continuing jurisdiction.

{¶ 35} 22. Thereafter, relator filed the instant mandamus action in this court.

Conclusions of Law:

{¶ 36} Relator makes two arguments here. First, relator contends that the commission abused its discretion by relying on the medical reports of Dr. Murphy to find that her allowed psychological condition only caused a mild impairment which was not work prohibitive. Relator contends that the commission had implicitly rejected Dr. Murphy's opinion when the commission granted her C-9 request for continued psychological treatment. Relator also contends that the commission abused its discretion by not addressing the fact that, despite her best effort, she was not able to successfully complete vocational rehabilitation. Relator contends that her inability to complete

vocational rehabilitation should have been considered as a factor favoring the granting of her PTD award.

{¶ 37} For the reasons that follow, the magistrate finds that the commission did not abuse its discretion when it relied on Dr. Murphy's psychological reports and the commission did not abuse its discretion when it did not specifically view relator's attempts at vocational rehabilitation as evidence that she was, in fact, permanently and totally disabled.

{¶ 38} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986). On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. *State ex rel. Lewis v. Diamond Foundry Co.*, 29 Ohio St.3d 56 (1987). Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165 (1981).

{¶ 39} The relevant inquiry in a determination of permanent total disability is claimant's ability to do any sustained remunerative employment. *State ex rel. Domjancic v. Indus. Comm.*, 69 Ohio St.3d 693 (1994). Generally, in making this determination, the commission must consider not only medical impairments but also the claimant's age, education, work record and other relevant non-medical factors. *State ex rel. Stephenson v. Indus. Comm.*, 31 Ohio St.3d 167 (1987). Thus, a claimant's medical capacity to work is not dispositive if the claimant's non-medical factors foreclose employability. *State ex rel. Gay v. Mihm*, 68 Ohio St.3d 315 (1994). The commission must also specify in its order what evidence has been relied upon and briefly explain the reasoning for its decision. *State ex rel. Noll v. Indus. Comm.*, 57 Ohio St.3d 203 (1991).

{¶ 40} Relator's first argument is that the commission abused its discretion when it relied on the reports of Dr. Murphy. Relator contends that because the commission

granted her request for psychological treatment, the commission had implicitly rejected Dr. Murphy's May 14, 2012 addendum report which had been prepared after his December 16, 2011 examination and report wherein he opined that relator was entitled to PTD compensation.  In his original December 16, 2011 report, Dr. Murphy opined that relator's psychological impairment was mild and not work prohibitive.  In his May 14, 2012 addendum, Dr. Murphy was asked whether or not relator's request for psychotherapy consisting of one visit every 2 weeks for 6 months and medication management once every 12 weeks for 6 months was medically necessary.  Dr. Murphy specifically concluded that some treatment was necessary, but not to the extent requested.  Specifically, Dr. Murphy opined that psychiatric medication management should be limited to two visits a year and that, while psychotherapy should not be discontinued abruptly, he recommended four to six sessions to prepare the injured worker to terminate services.

{¶ 41} When the request for treatment was heard before an SHO, the SHO relied on the medical report of Dr. Patel and authorized limited psychotherapy with medication management with Dr. Patel one time every 12 weeks for 6 months and individual psychotherapy with Cathy Stone at a frequency of one time every 2 weeks for 6 months.

{¶ 42} The "implicit rejection" concept set out in *State ex rel. Zamora* v. *Indus. Comm.*, 45 Ohio St.3d 17 (1989), applies where the commission makes a finding which is necessarily premised on the rejection of a given doctor's conclusion.  The court held that, once the commission has done so, the commission cannot later revive that report as evidence to support a later finding.  In *Zamora*, the regional board had concluded that Rosalio Zamora's claim should be additionally allowed for depression in the moderate range, implicitly rejecting Dr. Kugut's report which stated that Zamora had a moderate mental impairment of 40 to 50 percent, but that Zamora's depression preceded her 1963 injury and that the 1963 injury's contribution to her current depression was minimal, less than 10 percent.  However, the commission later denied Zamora's PTD award, expressly relying on Dr. Kugut's report.  The court held that Dr. Kugut's report could not constitute some evidence against a finding of PTD because it would be inconsistent to permit the commission to reject Dr. Kugut's report at one level for whatever reason, and then rely on it at another level.

{¶ 43} Relator asserts that the commission implicitly rejected both Dr. Murphy's December 16, 2011 report and his May 14, 2012 addendum report when the commission granted relator's motion seeking additional psychological treatment. For the reasons that follow, the magistrate disagrees.

{¶ 44} The magistrate finds that this situation is similar to the situation found in *State ex rel. Kish v. Kroger Co., 135* Ohio St.3d 451, 2013-Ohio-1931. Becky Kish sustained a work-related injury during her employment with Kroger. In February 2009, Kish was examined by Dr. David C. Randolph, to determine whether further treatment was necessary and appropriate. In a report dated March 5, 2009, Dr. Randolph identified and accepted the allowed conditions, noted Kish's current complaints and the medical records which he reviewed, and provided his physical findings upon examination. Dr. Randolph concluded that Kish required no further medical treatment. As a result, Kish was notified that Kroger would no longer pay for her treatment or medications.

{¶ 45} Kish filed a motion asking the commission to authorize continuing treatment and medications and, one week later, filed a motion for scheduled loss compensation for the loss of use of her left arm. Kish submitted a report from Dr. Douglas C. Gula, in support of both motions.

{¶ 46} In April 2009, a district hearing officer ("DHO") authorized Kish's current treatment and medications based on the reports from Dr. Gula and another doctor.

{¶ 47} On June 21, 2009, Dr. Randolph prepared an addendum to his original report in which he specifically addressed the alleged loss of Kish's left arm. According to Dr. Randolph, there was no objective evidence to support Kish's claim and Dr. Gula's opinion was invalid because he had merely relied on her self-reporting of pain and loss of function and had not made any objective findings to support those claims.

{¶ 48} In August 2009, a DHO denied Kish's motion for compensation for the loss of use of her left arm based on Dr. Randolph's June addendum. The DHO specifically rejected Dr. Gula's opinion.

{¶ 49} Kish appealed and each doctor responded in writing to the DHO's decision. Dr. Gula clarified that Kish's loss of use her left arm was based on the allowed condition of fracture dislocation left elbow, with associated compartment syndrome, and, in October,

Dr. Randolph repeated his opinion that Kish did not suffer a total loss of use of her left arm and that Dr. Gula's opinion was not supported by objective evidence.

{¶ 50} Ultimately, an SHO denied the motion based on Dr. Randolph's June and October addendum specifically noting that there were no objective abnormalities to support a total loss of use.

{¶ 51} Kish filed a complaint for a writ of mandamus in this court; however, this court denied her request finding that Dr. Randolph's reports constituted some evidence upon which the commission could rely to support its decision denying her request for a loss of use of her left arm.

{¶ 52} Kish appealed and the Supreme Court of Ohio upheld this court's decision. Specifically, the court rejected Kish's argument that Dr. Randolph's reports could not be considered as they had been implicitly rejected.  The court stated:

> As the court of appeals concluded, the commission did not rely on Dr. Randolph's March 2009 report in its order denying the loss-of-use motion but instead relied on his later addenda, so there was no violation of *Zamora.* Furthermore, although the commission had implicitly rejected Dr. Randolph's conclusion regarding the continuation of medical treatment, it did not reject the clinical findings from his initial examination. His later addenda relied on those clinical findings, but addressed a different issue—specifically, the loss of use of the left arm. It was within the commission's discretion to rely on those reports. *State ex rel. Crocker v. Indus. Comm.,* 111 Ohio St.3d 202, 2006-Ohio-5483, 855 N.E.2d 848, ¶ 16 (*Zamora* does not mean that the commission can *never* rely on a report from a doctor whose opinion has been rejected. "What the commission cannot do is accept the same doctor's opinion on one matter that it previously rejected"). *See also State ex rel. Value City Dept. Stores v. Indus. Comm.,* 97 Ohio St.3d 187, 2002-Ohio-5810, 777 N.E.2d 249, ¶ 22.

{¶ 53} Here, relator contends that, because the commission granted her request for psychological counseling and medication as her treating physician requested, the commission implicitly rejected Dr. Murphy's report.  However, as noted previously, Dr. Murphy essentially issued two reports.  In his first report, dated December 16, 2011, Dr. Murphy opined that relator's allowed psychological condition was mild and did not render her permanently and totally disabled.  In his second report, dated May 14, 2012, Dr.

Murphy opined that the request for additional treatment should not be granted as requested, but should be granted at a lesser rate. These reports were prepared for two entirely different reasons: (1) to determine whether or not relator was permanently and totally disabled due to the allowed psychological condition, and (2) to determine whether the requested counseling and medication were medically necessary. By rejecting Dr. Murphy's opinion with regard to counseling and treatment, the commission did not reject his opinion as to whether or not the allowed psychological condition rendered relator permanently and totally disabled. As such, just as in *Kish*, the principles of *Zamora* did not apply here.

{¶ 54} Relator's second argument is that the commission abused its discretion by not looking at her attempts at vocational rehabilitation and noting that, inasmuch as she failed in those attempts, she should be awarded PTD compensation.

{¶ 55} Relator's second argument is that the commission should have viewed her failed attempts at vocational rehabilitation as evidence that she was, in fact, permanently and totally disabled. Relator relies on this court's decision in *State ex rel. Ramsey v. Indus. Comm.,* 10th Dist. No. 99AP-733 (Mar. 30, 2000). For the reasons that follow, the magistrate finds that this court's decision in *Ramsey* does not apply here.

{¶ 56} Robert Ramsey was seriously injured in 1994. In 1996, Ramsey filed an application for PTD compensation which was denied. Shortly thereafter, Ramsey submitted to multiple evaluations performed by the commission's professional staff at the J. Leonard Camera Rehabilitation Center. Ramsey participated in the rehabilitation program through December 1997 at which time it was determined that he was an extremely poor candidate for rehabilitation and his filed was closed.

{¶ 57} Ramsey filed a second application for PTD compensation which was denied. The SHO relied on the report of Dr. Turner who concluded that Ramsey was capable of returning to his long-term career as an automobile sales person.

{¶ 58} Ramsey filed a mandamus action here asking whether the absence of any mention of the commission's rehabilitation report of record and the commission's order was a violation of the principle originally set forth in *State ex rel. Fultz v. Indus. Comm.,* 69 Ohio St.3d 327 1994), and whether the commission's non-medical analysis violated *Noll* because the analysis did not attempt to reconcile the conclusion that Ramsey was

capable of sustained remunerative employment with the commission's rehabilitation reports of record.

{¶ 59} This court's magistrate found that the commission's order did not violate the principle of *Fultz* and that the order complied with *Noll.* Specifically, the magistrate noted that, because the commission does not have to list the evidence considered, the presumption of regularity that attaches to commission proceedings gives rise to a second presumption—that the commission indeed considered all the evidence before it. Because the commission's order did not necessarily enumerate the evidence considered, the magistrate found that there was no violation of *Fultz.*

{¶ 60} The magistrate also rejected Ramsey's second argument finding that the commission was not required to explain why it chose not to rely on the rehabilitation reports. The magistrate also indicated that the commission did not have a duty to address rehabilitation efforts.

> In rejecting the decision of its magistrate, this court stated:
>
> The staff hearing officer who heard Mr. Ramsey's case did not appear to give any weight to Mr. Ramsey's efforts at rehabilitation. Instead, the staff hearing officer apparently relied solely upon "the objective medical findings of an unbiased examiner."
>
> We do not believe that reeducation and retraining efforts can only be used as a means to punish injured workers on those occasions when a hearing officer feels that the injured worker has failed to exercise his or her best efforts at rehabilitation. The situation where an injured workers has made serious efforts at rehabilitation but has not succeeded should be considered as a factor in favor of granting PTD compensation, especially where, as here, the Bureau of Workers' Compensation's own reports demonstrated a failure to be rehabilitated despite the injured worker's best efforts. Since the record before us indicates that the staff hearing officer did not give appropriate weight to Mr. Ramsey's unsuccessful rehabilitation efforts and the reports from the J. Leonard Camera Rehabilitation Center, a writ of mandamus shall issue.
>
> The order from the staff hearing officer reflects a related flaw, the failure to consider vocational information available in the file. We still believe that the better course of action would be for the commission to list all the reports

considered, not just the reports relied upon. Such listing of reports would enable the courts to be assured that all the reports were considered and would avoid the temptation a hearing officer might feel to pick out only the reports of commission specialists for review. Such a temptation would be understandable, given the sheer volume of applications to be considered. However, injured workers whose livelihood depends upon the findings of the commission deserve a thorough review, not just a quick review.

For us, *State ex rel. Fultz v. Indus. Comm.* (1994), 69 Ohio St.3d 327, 631 N.E.2d 1057, was a step in the right direction. Where reports in the file could be determinative, the commission must reflect a review of those reports in the order granting or denying PTD compensation. The order denying PTD compensation for Mr. Ramsey does not reflect consideration of the vocational reports, but seems to rely almost completely on "the objective medical findings of an unbiased examiner," as noted above. Thus, we find that neither the spirit nor the letter of *Fultz* was honored here.

*Ramsey.*

{¶ 61} This court's decision in *Ramsey* has been limited. For example, in *State ex rel. Scaggs v. Indus. Comm.,* 10th Dist. No. 02AP-799, 2003-Ohio-1786, this court stated:

[R]elator cites *State ex rel. Ramsey v. Indus. Comm.* (Mar. 30, 2000), Franklin App. No. 99AP-733; and *State ex rel. Burns v. Indus. Comm.,* Franklin App. No. 01AP-1036, 2002-Ohio-2804, in arguing that, where reports in the file could be determinative, the commission's order granting or denying permanent total disability compensation must reflect a review of those reports. However, relator's argument is valid only when the commission provides a list of all evidence considered, and then omits reference to a report that could have been determinative of the issue. In *State ex rel. Lovell v. Indus. Comm.* (1996), 74 Ohio St.3d 250, 252-253, 658 N.E.2d 284, the Supreme Court of Ohio held that the commission has no obligation to identify all of the evidence considered, and when the commission does not provide such a list, there is a presumption that the commission considered all of the evidence before it. That presumption is applicable here, because, as noted by the magistrate, the commission did not list all of the evidence considered. Therefore, the rationale discussed in *Ramsey* and *Burns* does not apply. Nor did relator present any evidence to rebut the presumption that the commission

> considered all of the relevant evidence, including the *Kilcher* report.
>
> Furthermore, because the commission is a vocational evaluator with considerable expertise, it may form its own independent opinion without regard to the opinions of vocational experts, e.g., *State ex rel. Jackson v. Indus. Comm.* (1997), 79 Ohio St.3d 261. Therefore, the commission did not need to address the report of Mr. Kilcher in reaching its decision.

*Id.* at ¶ 7-8.

{¶ 62} More recently, the Supreme Court of Ohio upheld this court's decision in *State ex rel. Guthrie v. Indus. Comm.,* 133 Ohio St.3d 244, 2012-Ohio-4637, ¶ 10-14, wherein this court again distinguished *Ramsey.* Specifically, the court stated:

> In her second proposition of law, Guthrie argues that the SHO improperly refused to consider her rehabilitation attempt as a factor in favor of PTD. Guthrie states that she made serious attempts at rehabilitation over a five-year period and that the SHO unfairly discounted those efforts. She implies that the SHO denied PTD to punish her for ignoring the rehabilitation division's advice. She criticizes the SHO's suggestion that her rehabilitation efforts were unsatisfactory and cites *State ex rel. Ramsey v. Indus. Comm.* 10th Dist. No. 99AP-733, 2000 WL 329058 (Mar. 30, 2000), *affirmed without opinion,* 91 Ohio St.3d 24, 740 N.E.2d 672 (2001), as support for the proposition that the commission denied PTD punitively.
>
> *Ramsey,* however, is inapposite. First and foremost, according to the *Ramsey* court, the order denying PTD in that case appeared to rely solely upon the medical evidence, ignoring vocational information available in the file. The court held that the SHO had abused his discretion by failing to consider relevant vocational evidence. By contrast, the SHO in the instant case considered all factors before denying PTD. This court cannot second-guess her evaluation of the evidence. *State ex rel. George v. Indus. Comm.,* 130 Ohio St.3d 405, 2011-Ohio-6036, 958 N.E.2d 948, ¶ 11 (the commission is exclusively responsible for assessing the weight and credibility of the evidence).
>
> Second, even if *Ramsey* were not distinguishable for this reason, the language relied upon by Guthrie does not avail

her. The vocational evidence in *Ramsey* showed that the claimant failed at rehabilitation, even though he did his best to succeed. In issuing a limited writ ordering the commission to consider that evidence, the court of appeals remarked that failure at rehabilitation is not always a negative factor, "used as a means to punish injured workers on those occasions when a hearing officer feels that the injured worker has failed to exercise his or her best efforts at rehabilitation." 2000 WL 329058, *1. The court emphasized that a claimant's good-faith, best-effort failure should be considered as a positive factor in favor of granting PTD compensation.

There is no basis in this case for imputing to the SHO a desire to punish the claimant because she failed at rehabilitation. The SHO considered all of the evidence. The denial of PTD that followed was not "punishment"; it was the natural consequence of Guthrie's failure to carry her burden of proof. Only when a denial is issued against a claimant who is *incapable* of sustained remunerative employment due to allowed conditions or a combination of those conditions and vocational factors can the denial be considered unjust and possibly punitive.

The fact that the SHO did not view Guthrie's rehabilitation efforts favorably does not affect the validity of the order. The commission is exclusively responsible for interpreting the vocational evidence before it. [*State ex rel. Ellis v. McGraw Edison Co.,* 66 Ohio St.3d 92, 94, 609 N.E.2d 164 (1993)], 66 Ohio St.3d at 94, 609 N.E.2d 164 (1993)]; [*State ex rel. Jackson v. Indus. Comm.*] 79 Ohio St.3d 266, 271, 680 N.E.2d 1233 (1233)]. Here, the rehabilitation division made both favorable and unfavorable comments about Guthrie's participation, and the commission was permitted to accept the latter over the former. Thus, we find no abuse of discretion.

(Footnote deleted.)

{¶ 63} In the present case, as noted in the findings of fact, relator stopped working in 2002 and did not attempt vocational rehabilitation until after her first application for PTD compensation was denied in 2010. Relator participated in vocational rehabilitation for approximately three months and then filed her second application for PTD compensation. By comparison, Ramsey had participated in vocational rehabilitation for approximately one year. Further, as noted in the findings of fact, the reports from the

rehabilitation division made both positive and negative comments concerning relator's efforts and progress and there is no contemporaneous medical evidence concerning her condition from 2002 through 2009 that would indicate that she had been unable to participate.  This magistrate cannot say that the same potential for error exists here as this court determined existed in *Ramsey*.  As such, the magistrate rejects relator's argument.

{¶ 64} Based on the foregoing, it is this magistrate's decision that relator has not demonstrated that the commission abused its discretion in denying relator's application for PTD compensation and this court should deny relator's request for a writ of mandamus.

*/S/ MAGISTRATE*
**STEPHANIE BISCA BROOKS**


### NOTICE TO THE PARTIES

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).